UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

QUARTERNORTH ENERGY LLC, ET
AL.

CIVIL ACTION

VERSUS

NO. 22-1852

SUPREME OFFSHORE SERVICES,
INC., ET AL.

SECTION "R" (1)

## ORDER AND REASONS

Before the Court are defendant Express Weld, LLC's ("Express Weld") motion for summary judgment,[1] plaintiffs' cross-motion for summary judgment against Express Weld,[2] and plaintiffs' motion for summary judgment against defendant Supreme Offshore Services, Inc. ("Supreme").[3] For the following reasons, the Court DENIES Express Weld's motion for summary judgment and plaintiffs' cross-motion for summary judgment against Express Weld.[4]  The Court GRANTS plaintiffs' motion for summary judgment against Supreme.[5]

---

[1]     R. Doc. 16.
[2]     R. Doc. 18.
[3]     R. Doc. 17.
[4]     R. Docs. 16 & 18.
[5]     R. Doc. 17.

## I.    BACKGROUND

This case is a declaratory judgment action filed by plaintiffs Fieldwood Energy III, LLC, and QuarterNorth Energy, LLC, successors to Fieldwood Energy LLC ("Fieldwood"),[6] in which they seek a judicial declaration regarding their obligation to provide defense and indemnity to defendants in a separate lawsuit.

On January 1, 2014, Fieldwood and non-party Kilgore Marine Services, LLC ("Kilgore") entered into a master time charter agreement, pursuant to which Kilgore agreed to act as a broker to help Fieldwood charter vessels for use in Fieldwood's oil and gas operations (the "Master Time Charter").[7]   A few months later, on May 13, 2014, defendant Supreme entered into a brokerage agreement with Kilgore, by which Supreme appointed Kilgore to be Supreme's agent for purposes of obtaining charters or similar work contracts for Supreme's vessels (the "Brokerage Agreement").[8]   Pursuant to these agreements, Kilgore ultimately facilitated Fieldwood's charter of the M/V PENNY F, a vessel owned and operated by Supreme.

---

[6]    R. Doc. 17-4 ¶¶ 16-17 (Plaintiffs' Statement of Uncontested Facts).
[7]    *Id.* ¶¶ 10-11.
[8]    *Id.* ¶ 3.

Separately, on May 7, 2015, Fieldwood entered into a contract with defendant Express Weld pursuant to which Express Weld would perform various services to facilitate Fieldwood's oil and gas operations (the "Master Service Contract").[9] One such service was permitting Fieldwood to use Express Weld's dock in Port Fourchon, Louisiana.[10] On September 9, 2020, Joseph Pigott, Fieldwood's employee, slipped while disembarking from the M/V PENNY F and fell onto Express Weld's dock.[11] Pigott sued Supreme and Express Weld for damages arising from the injuries he sustained in the fall.[12]

Supreme and Express Weld both made written demands to plaintiffs for defense and indemnification for Pigott's claims.[13] Plaintiffs then filed this action seeking a judicial declaration that Supreme's contractual defense and indemnity claims against plaintiffs have been released, and that Express Weld's contractual defense and indemnity claims against plaintiffs are void as a matter of law pursuant to the Louisiana Oilfield Indemnity Act (the "LOIA").[14] In its answer, Supreme filed counterclaims for a declaratory

---

[9]   R. Doc. 16-4.

[10]  R. Doc. 17-4 ¶ 1.

[11]  R. Doc. 16-3 (Express Weld's Statement of Uncontested Facts); R. Doc. 17-4 ¶ 1.

[12]  R. Doc. 1 at 1.

[13]  *Id.*

[14]  *Id.* at 3-7.   Plaintiffs also assert in their complaint that the indemnification provision is void under the Louisiana Motor Carrier Transportation and Construction Indemnity Act, but they do not assert

judgment regarding plaintiffs' duty to defend, and for breach of plaintiffs' duty to defend and indemnify Supreme.[15]

Express Weld then moved for summary judgment.[16]  In its motion, Express Weld argues that the Master Service Contract requires plaintiffs to defend and indemnify it from Pigott's claims.  It contends that the Master Service Contract is a maritime contract, so it is governed by federal maritime law rather than Louisiana law.[17]  Accordingly, it contends that the LOIA does not apply to the Master Service Contract.[18]  Plaintiffs opposed the motion, contending that the Master Service Contract is not a maritime contract, so Louisiana law governs the contract and provides that the indemnity provisions therein are legally void.[19]  Plaintiffs also filed a cross-motion for summary judgment on the same basis,[20] which Express Weld opposed.[21]

Plaintiffs also moved for summary judgment on their claim against Supreme.[22]  In support of their motion, plaintiffs contend that in Supreme's

---

any arguments regarding that statute in their opposition to Express Weld's motion for summary judgment or in their cross-motion for summary judgment.

[15]   R. Doc. 6 at 11-14.
[16]   R. Doc. 16.
[17]   *Id.* at 1.
[18]   *Id.* at 5.
[19]   R. Doc. 19.
[20]   R. Doc. 18.
[21]   R. Doc. 30.
[22]   R. Doc. 17.

Brokerage Agreement with Kilgore, it broadly agreed to defend and indemnify vessel charterers, including Fieldwood. They contend that this provision of the Brokerage Agreement operates as a waiver of Supreme's counterclaims.[23]   Supreme opposed plaintiffs' motion, contending that Fieldwood must provide defense and indemnification to Supreme pursuant to the indemnification provision in the Master Time Charter, which, it argues, takes priority over the indemnification provision in the Brokerage Agreement.[24]

The Court considers the parties' arguments below.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or

---

[23]   R. Doc. 17-1 at 2.
[24]   R. Doc. 20.

weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075.  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).  "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's

evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A.      Plaintiffs' Obligations vis-à-vis Express Weld

The Master Service Contract between Fieldwood and Express Weld provides, in relevant part, that the

> Company hereby agrees to release, indemnify, protect, defend and hold harmless Contractor Group from and against any and all claims for . . . the injury, illness or death of any member of the Company Group . . . without regard to whether any such claim is caused, in whole or in part, by the negligence . . . or other fault (excluding only the gross negligence and intentional misconduct) of any member of the Contractor Group[.][25]

The Master Service Contract defines the "Company" as Fieldwood and the "Company Group" to include Fieldwood's employees, including Pigott.[26]   It defines the "Contractor Group" to include Express Weld.[27]   Express Weld claims that, based on the plain language of the indemnity provision in the Master Service Contract, plaintiffs are contractually obligated to defend and indemnify Express Weld from Pigott's claims.

Plaintiffs do not dispute that the plain language of the indemnification provision in the Master Service Contract covers Pigott's claims.   Rather, they assert that the indemnification provision is void under LOIA,[28] which applies to agreements "pertaining to wells for oil, gas, or water" and "declare[s] null and void any provision in any [such] agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is

---

[25]   R. Doc. 16-4 at 7.
[26]   *Id.* at 6.
[27]   *Id.*
[28]   R. Doc. 19 at 13.

8

negligence or fault . . . on the part of the indemnitee[.]"  La. Rev. Stat. §
9:2780(A).

"If Louisiana law applies, the indemnity agreement is void as against
public policy.  If, on the other hand, the contract is maritime and state law
does not apply, then the indemnity obligation is enforceable."  *In re Larry
Doiron, Inc.*, 879 F.3d 568, 571 (5th Cir. 2018).  Resolution of Express Weld's
motion and plaintiffs' cross-motion thus turns on whether the Master Service
Contract qualifies as a "maritime contract."

Fifth Circuit jurisprudence on this question "ha[s] long been confusing
and difficult to apply."  *Id.*  In *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d
313 (5th Cir. 1990), the Fifth Circuit established a multi-factor test to
determine whether a contract is maritime in nature:

> 1) what does the specific work order in effect at the time of the
> injury provide? 2) what work did the crew assigned under the
> work order actually do? 3) was the crew assigned to work aboard
> a vessel in navigable waters; 4) to what extend did the work being
> done relate to the mission of that vessel? 5) what was the
> principal work of the injured worker? and 6) what work was the
> injured worker actually doing at the time of injury?

*Id.* at 316.  Application of this multi-factor test "vexed [the Fifth Circuit] for
decades."  *Barrios v. Centaur, LLC*, 942 F.3d 670 (5th Cir. 2019).  Courts
applying the test criticized it as "confusing" and problematic on the grounds
that it "create[d] uncertainty, spawn[ed] litigation, and hinder[ed] the

rational calculation of costs and risks by companies participating in this industry." *Doiron*, 379 F.3d at 571 (quoting *Hoda v. Rowan Cos., Inc.*, 419 F.3d 379, 380 (5th Cir. 2005)).

In *Doiron*, the *en banc* Fifth Circuit eschewed the "unduly complicate[d]" multi-factor test in favor of a streamlined two-factor test to determine whether a contract qualifies as a maritime contract: "First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?" *Id.* at 576. "Second, if the answer to the above question is 'yes,' does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract? If so, the contract is maritime in nature." *Id.*

Since *Doiron* was decided, the Fifth Circuit has twice provided guidance on the question of when a mixed-services contract that facilitates oil and gas development constitutes a maritime contract. *Crescent Energy Servs., LLC v. Carrizo Oil & Gas, Inc.*, 896 F.3d 350 (5th Cir. 2018); *Barrios v. Centaur, LLC*, 942 F.3d 670 (5th Cir. 2019). The contract at issue in *Crescent Energy* involved the plugging and abandonment of offshore oil wells. Roughly half of the job involved "wireline work," the completion of which required Crescent to charter three vessels. *Id.* at 361. The Fifth Circuit held that the contract met the first prong of the *Dorion* test: Because the

wells at issue "were located within the territorial inland waters of Louisiana and . . . the vessels involved . . . were able to navigate them," the contract was one "to facilitate the drilling or production of oil and gas on navigable waters." *Id.* at 357. And because the contract "anticipated the constant and substantial use of multiple vessels," the second prong of *Dorion* was also satisfied. *Id.* at 361. The Fifth Circuit thus concluded that the contract was maritime in nature. *Id.*

*Barrios* also involved a mixed-services contract. *Barrios*, 942 F.3d at 674. The district court held that the contract, which provided for the construction of a containment rail on a dock, was a "land-based construction contract," so it was governed by Louisiana law. *Id.* The Fifth Circuit reversed, and in so doing, it emphasized that *Doiron* applies "to *any mixed-services contract*," not just oil-and-gas contracts. *Id.* at 680 (emphasis in original). It clarified that for a mixed-services contract to be maritime, it "(1) must be for services to facilitate activity on navigable waters and (2) must provide, or the parties must expect, that a vessel will play a substantial role in the completion of the contract." *Id.* The court held that both prongs were met. The first prong was "easily satisfie[d]" because it "required services to be performed to facilitate the loading, offloading, and transportation" of materials "via vessels on navigable waters." *Id.* at 681. The court held that

the second prong was satisfied, too.  To reach this conclusion, the court relied on evidence that contract price was "significantly higher due to having [a] crane barge on site," that the job could not have been done properly without the crane barge, and that the crew undertook a number of activities on the barge, including performing construction work, storing and packing tools, holding safety meetings, taking breaks, and eating lunch.  The court thus concluded that the vessel played a "substantial role in the completion of the contract" even though the workers spent most of their time on the dock.  *Id.* at 681-82.

In this case, it is undisputed that the first prong of the *Doiron* test is met: The contract "provide[s] services to facilitate activity on navigable waters."[29]  *Id.* at 680.  The parties dispute whether second prong is met; namely, whether "the contract provide[s] or . . . the parties expect that a vessel will play a substantial role in the completion of the contract."  *Id.* "When considering whether there was a substantial involvement of a vessel, [courts] must remember that the contracting parties' expectations are central."  *Id.* (citing *Crescent Energy*, 896 F.3d at 359).  "When work is performed in part on a vessel and in part on a platform or on land, [courts]

---

[29]   R. Doc. 34 at 3 ("Fieldwood and Express Weld both agree that the Master Services Contract facilitated the drilling and production of oil and gas under the first *Doiron* criterion.").

should consider not only the time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract." *Id.* (citing *Doiron*, 879 F.3d at 576 n.47).

Here, it is clear that vessels were involved in the completion of the Master Service Contract.  The contract language is broad—it provides that Express Weld will "perform work, deliver goods, and render services hereunder within the boundaries of the United States and the outer continental shelf of the Gulf of Mexico."[30]   In practice, Express Weld performed a wide variety of services pursuant to the agreement.  Notably, Express Weld provided its dock in Port Fourchon to Fieldwood for "the loading [and] unloading of materials, equipment, chemicals, and other cargoes."[31]   The invoices plaintiffs provide for the months of August and September 2020 show that pursuant to the Master Service Contract, Express Weld invoiced Fieldwood for dockage, riggers, foremen, cranes, and forklifts for multiple vessels.[32]   These invoices indicate that Express Weld billed

---

[30]    R. Doc. 16-4 at 1.
[31]    R. Doc. 1 ¶ XVI.
[32]    R. Docs. 19-5 (invoice for services related to M/V PENNY F); 19-6 (invoice for services related to M/V KRISTIN FAGAN); 19-9 (invoice for services related to M/V MS MELISSA); 19-12 (invoice for services related to M/V SEACOR HAWK); 19-14 (invoice for services related to M/V MAN O' WAR).

Fieldwood more than $9,000 for dockage and other vessel-related services in September 2020, the month Pigott was injured.

Plaintiffs contend that the vessel-related work Express Weld performed was insubstantial when compared to its non-vessel related work. Among other things, Express Weld also performed work on Fieldwood's parking lot; it mowed the lawn; it performed electrical work on Fieldwood's Grand Isle Shore Base; it dumped rocks in that same location; it changed the oil, filters, and spark plugs on vehicles; it repaired a forklift; and it installed limestone.[33]  Plaintiffs contend that the month Pigott was injured, Express Weld billed Fieldwood over $7,000 for "non-vessel related charges."[34] Plaintiffs also contend that Express Weld invoiced Fieldwood over $23,000 per month for crane and forklift rentals, but do not indicate whether these cranes and forklifts were for vessel-related uses.

The Fifth Circuit instructs that a "rule of thumb" that "might be useful" to determine whether whether a vessel's involvement in the performance of a mixed-services contract is substantial is "the thirty-percent guideline in Jones Act cases." *Barrios*, 942 F.3d at 681.  In determining whether workers have a sufficiently substantial connection to a vessel to qualify as a seaman

---

[33]   R. Doc. 18-1 at 7.

[34]   *Id.*

14

for purposes of the Jones Act, courts in the Fifth Circuit generally find that workers who spend less than thirty percent of their time "in the service of a vessel in navigation" do not qualify as a seaman. *Doiron*, 879 F.3d at 576 n.4 ("The district courts may develop a similar rule of thumb in evaluating substantiality in this context."). Plaintiffs invoke the thirty-percent rule, and contend that the month Pigott was injured, only 12% of the total amount Express Weld billed Fieldwood related to the M/V PENNY F. But the Court must consider the involvement of all vessels in the completion of the contract, not just the involvement of the particular vessel on which the injury occurred, and not just during the month the injury occurred. *See, e.g.*, *Crescent Energy*, 896 F.3d at 352 (considering involvement of all vessels involved in the performance of the contract—not just the vessel on which the worker was injured—to determine whether use of vessels was "substantial").

The parties do not provide the Court with sufficient information about the total value of vessel-related services vis-à-vis non-vessel related services over the life of the Master Service Contract to determine whether the involvement of vessels was sufficiently substantial for the contract to qualify as a maritime contract. For instance, plaintiffs' invoices show that Express Weld billed Fieldwood for over $9,000 for vessel-related services and over $7,000 for non-vessel related services in September 2020, but they do not

15

indicate whether the largest expense that month—the $23,100 rental of cranes and forklifts—related to vessels.  Further, the invoices show that Express Weld billed Fieldwood over $22,000 for non-vessel related services in October of 2020, but the parties do not provide any invoices showing the value of the vessel-related services Express Weld provided that month.

Plaintiffs also contend that regardless of the value of the vessel-related services Express Weld provided, the contract cannot be maritime in nature because leases for docks are non-maritime in nature.[35]  Plaintiffs rely on a footnote from the *Barrios* decision, in which the Fifth Circuit stated, in dicta, that "contracts for wharfage that don't relate to a specific vessel" would "presumably remain nonmaritime" after *Doiron*.  *Barrios*, 942 F.3d at 680 n.13.  In support of this proposition, the court cited to *Lightering LLC v. Techman Grp., LLC*, for the general rule that disputes over dock or wharf leases that do not relate to a specific vessel typically do not fall within admiralty jurisdiction.  328 F. Supp. 3d 625, 638 (S.D. Tex. 2018) (collecting cases); *see also Corpus Christi Alumina, LLC v. Jesco Constr. Corp.*, No. 19-12, 2020 WL 10817174, at *2 (S.D. Tex. Dec. 16, 2020) ("*Barrios* abrogated the test applied in *Lightering*, but did not overrule the reasoning Courts have relied on to hold that pure dock lease contracts do not have sufficient

---

[35]   R. Doc. 18-1 at 11.

maritime nexus to invoke admiralty.") (collecting cases).  But the Master Service Contract is not a "pure dock lease contract."   Rather, it is an agreement to provide both dockage and services related to loading and unloading cargo for various vessels, which services are typically considered maritime in nature.  *See Hertz v. Treasure Chest Casino,* LLC, 24 F. Supp. 2d 795, 802 (E.D. La. 2003) ("[C]ontracts concerning the loading or the offloading of cargo to and from ships . . . are considered maritime[.]").  And although the Master Service Contract does not, on its face, identify a specific vessel or vessels to which Express Weld would provide services, courts must consider "both the [Master Service Contract] and the specific work in question," as "both make up the contract at issue."  *Carr v. Yellowfin Marine Servs., LLC*, 423 F. Supp. 3d 316, 321 (E.D. La. Oct. 30, 2019).  The invoices plaintiffs provide demonstrate that the "specific work" Express Weld provided pursuant to the Master Service Contract related to identified vessels.[36]

In sum, it is clear that vessels were involved in the performance of the Master Service Contract, but the Court cannot ascertain from the evidence provided whether the vessel-based services comprised at least thirty percent of the contract.  The involvement of vessels here was considerably more

---

[36]     *See, e.g.*, R. Doc. 19-12.

substantial than the involvement of vessels in the contract at issue in *Doiron*, where vessels were only chartered in response to an unanticipated issue, 879 F.3d at 577.  Nevertheless, the Court cannot determine at this stage whether the use of vessels in the completion of the Master Service Contract was sufficiently substantial for the contract to qualify as a maritime contract.  *See Crescent Energy*, 896 F.3d at 361 (involvement of vessels in completion of the contract was "substantial" when 50% of the work contemplated by the contract could not be performed without the use of vessels); *Barrios*, 942 F.3d at 681 (involvement of vessels in completion of the contract was "substantial" when the sole purpose of the contract—construction on the dock—could not have been performed without vessels, and the use of such vessels considerably increased the contract price).  Because there is a genuine dispute of material fact as to whether the vessel-related services were "substantial," neither plaintiffs nor Express Weld are entitled to summary judgment on the issue of plaintiffs' indemnity obligations vis-à-vis Express Weld.

### B.     Plaintiffs' Obligations vis-à-vis Supreme

As discussed in Section I, *supra*, when Pigott filed his lawsuit, Supreme demanded defense and indemnification from plaintiffs.  Plaintiffs then filed

this action seeking a judicial declaration that they do not owe defense or indemnification to Supreme, and Supreme counterclaimed.[37]  Plaintiffs then moved for summary judgment on their claim against Supreme.[38]  Resolution of plaintiffs' motion turns on the proper interpretation of the indemnification provisions in two separate agreements.

The first relevant agreement is the Master Time Charter between Fieldwood and Kilgore, dated January 1, 2014.[39]  Pursuant to that agreement, Kilgore agreed to help Fieldwood charter vessels for use in Fieldwood's oil and gas operations.  The Master Time Charter defines Fieldwood as the "Charterer," and it defines Kilgore as the "Owner."[40]  It includes an indemnity provision that states that Fieldwood "hereby agrees to Release, Indemnify, Protect, Defend and Hold Harmless Owner Group from and against any and all claims arising out of or related to . . . the injury, illness or death of any member of Charterer Group."[41]  It defines "Owner Group" to

---

[37]     R. Docs. 1 & 6.

[38]     R. Doc. 17.

[39]     R. Doc. 17-6 at 1 (Master Time Charter).

[40]     Supreme, not Kilgore, is the owner of the M/V PENNY F, which Kilgore helped Fieldwood charter.  Although Kilgore is defined as the owner "Owner," the Master Time Charter contemplated that Kilgore would assist Fieldwood with chartering vessel for which Kilgore served as the broker rather than the owner.  *Id.* ¶ 2 (Master Time Charter).

[41]     *Id.* ¶ 12(b)(ii).

include the owners and operators of chartered vessels.[42]   It defines
"Charterer Group" to include Fieldwood's employees.[43]   Accordingly, by its
plain terms, the indemnity provision of the Master Time Charter provides
that Fieldwood must defend and indemnify owners of the vessels it charters,
like Supreme, from the personal injury claims of its own employees, like
Pigott.

The second relevant agreement is the Brokerage Agreement between
Supreme and Kilgore, dated May 13, 2014.   Pursuant to that agreement,
Kilgore agreed to serve as Supreme's agent for obtaining charters and similar
work contracts for Supreme's vessels.[44]   Article 5 of the Brokerage
Agreement, the indemnification provision, states that Supreme

> agrees to protect, defend, and indemnify . . . Broker Group for,
> from and against . . . any and all claims, demands, causes of
> action and liabilities of every kind and character, whether to
> person or property . . . including, but not limited to personal
> injury, . . . without limit and without regard to the cause of causes
> thereof or the alleged . . . negligence, breach of warranty or
> contract, fault or unseaworthiness of Broker Group . . . whether
> brought of presented by [Supreme] or by an employee, servant,
> and/or agent of [Supreme] . . . arising directly or indirectly out
> of, incident to, and/or connected with the work and/or services
> to be performed under this agreement[.][45]

---

[42]   *Id.* ¶ 12(a)(iii).

[43]   *Id.* ¶ 12(a)(ii).

[44]   R. Doc. 17-4 ¶ 4 (Plaintiffs' Statement of Uncontested Facts).

[45]   R. Doc. 17-5 ¶ 5 (Brokerage Agreement).

20

The Brokerage Agreement defines the "Broker Group" as Kilgore and "any Charterer or customer for whom work is to be performed."[46]  In other words, Supreme broadly agreed to indemnify all charterers, including Fieldwood, from all claims connected with or arising out of the services provided under the Brokerage Agreement.

Supreme is not a party to the Master Time Charter, the contract it seeks to enforce, nor is Fieldwood a party to the Brokerage Agreement, the contract plaintiffs seek to enforce.  The following chart depicts the relationship between the parties:



There is no dispute that the Brokerage Agreement and the Master Time Charter are both maritime contracts that are governed by federal maritime law.[47] *See Bourg v. Chevron USA, Inc.*, 91 F.3d 141, at *1 (5th Cir. 1996) ("A charter agreement for a vessel is a maritime contract, to be construed according to maritime law."); *Fleet Operators, Inc. v. Nautilus Ins. Co.*, No. 19-313, 2022 WL 2865871, at *2 (S.D. Tex. July 18, 2022) (treating virtually identical master time charter agreement and brokerage agreement as "maritime contracts interpreted under general maritime law").    Under federal maritime law, "[a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986).

Supreme's counterclaims are premised on the Master Time Charter, pursuant to which Fieldwood agreed to indemnify and defend owners of the vessels it chartered, including Supreme, for personal injury claims of

---

[47]    R. Doc. 20.

Fieldwood's employees.[48]   Supreme asserts that Pigott's claims against Supreme fall squarely within the purview of the indemnification provision of the Master Time Charter, so plaintiffs must provide defense and indemnification.

Plaintiffs invoke Article 5 of the Brokerage Agreement.  They contend that because Supreme agreed to defend and indemnify charterers, including Fieldwood, for "claims, causes of action and liabilities of every kind and character," including breach of contract claims, that are connected to the services provided under the Brokerage Agreement, Supreme effectively agreed to indemnify Fieldwood from Supreme's own counterclaims for breach of the Master Time Charter's indemnity provision.[49]   Plaintiffs contend that Supreme thus waived its right to bring its counterclaims, thereby warranting dismissal.

Supreme does not dispute that the indemnification provision in the Brokerage Agreement is broad.   Rather, Supreme argues that the indemnification provision in the Master Time Charter, rather than the indemnification provision in the Brokerage Agreement, controls this

---

[48]    R. Doc. 6 ¶¶ 24-33.
[49]    R. Doc. 17 at 2.

dispute.[50]  Otherwise, Supreme contends, the indemnification provision in the Master Time Charter Agreement would be rendered a nullity.[51]

Several district courts in the Fifth Circuit have recently ruled on the impact of similar indemnification provisions in brokerage agreements.  The most recent and relevant decision is in *Fleet Operators, Inc. v. Nautilus Ins. Co.*, No. 19-313, 2022 WL 2865871 (S.D. Tex. July 18, 2022).  In that case, much like here, Kilgore served as the agent of the operator of a vessel pursuant to a brokerage agreement.  *Id.* at *1.  Kilgore also entered into a master time charter agreement with Fieldwood, pursuant to which Fieldwood chartered the vessel.  *Id.*  A worker aboard the vessel was injured and sued the vessel operator, among others, for damages.  *Id.*  The vessel operator sought defense and indemnification from Fieldwood for the worker's claims pursuant to the indemnification provision in the master time charter agreement between Kilgore and Fieldwood.  *Id.* at *2.  Fieldwood invoked the vessel operator's brokerage agreement with Kilgore in its defense.  *Id.*  As in this case, Fieldwood argued that the vessel operator agreed in the brokerage agreement to indemnify all charterers, including Fieldwood, which effectively acted as a waiver of the vessel operator's ability

---

[50]   R. Doc. 20 at 2.
[51]   *Id.*

to bring a claim against Fieldwood to enforce the indemnity provision in the master time charter agreement. *Id.* In response, the vessel operator argued that the master time charter agreement, rather than the brokerage agreement, controlled the parties' indemnity obligations. *Id.*

The court held that Article 5 of the brokerage agreement between the vessel operator and Kilgore applied to the vessel operator's claim to enforce the indemnity provision in the master time charter agreement. *Id.* at *3. The court then considered whether the indemnification provision in the master time charter agreement between Kilgore and Fieldwood took priority over Article 5 of the brokerage agreement. The court noted that the brokerage agreement expressly contemplated that vessels would be chartered through a master time charter agreement, and that the master time charter agreement purported to "govern the respective rights and duties of Owner and Charterer with respect to the charter of Owner's vessel(s) by Charterer." *Id.* at *4. The court nevertheless concluded that the brokerage agreement "does not expressly yield priority and authority to the [master time charter agreement]." *Id.* It thus held that because the vessel operator agreed to "defend and indemnity Fieldwood from Fieldwood's alleged breach-of-contract claim" premised on Fieldwood's failure to indemnify the vessel

operator, the vessel operator's "claims against Fieldwood ha[d] been released and waived as a matter of law." *Id.* at *5.

In reaching its conclusion that the indemnity provision in the master time charter agreement did not control, the *Fleet Operators* court relied on *Knox v. Bisso Marine, LLC*, which also dealt with the impact of a similar indemnification provision in a brokerage agreement. No. 16-13350, 2017 WL 2098876 (E.D. La. May 15, 2017). In that case, the owner of a vessel on which a worker was injured argued that the indemnity provision in the master time charter agreement required the charterer of the vessel to defend and indemnify the vessel owner for the injured worker's damages. *Id.* at *3. In so doing, the vessel owner, much like Supreme, argued that the indemnification provision of the master time charter agreement superseded the indemnity provision in a brokerage agreement the vessel owner entered into with Kilgore. *Id.* The court rejected the vessel owner's argument, holding that nothing in the brokerage agreement "expressly state[d] that the defense and indemnity obligations in a master time charter pre-empt or prime the obligations of [the brokerage agreement]." *Id.*

The same is true here. The Brokerage Agreement does not indicate that the indemnification provision of the Master Time Charter supersedes its own indemnification provision. And much like in *Fleet Operators*, Supreme's

26

claims against Fieldwood qualify as the type of claim for which Supreme agreed to indemnify Fieldwood under the Brokerage Agreement: Supreme's claims are premised on Fieldwood's alleged breach of its contractual duty to indemnify, and its claims arose out of, were incidental to, or were connected with "the work and/or services to be performed under the Brokerage Agreement." *Fleet Operators*, 2022 WL 2865871, at *3 (quoting Article 5 of the brokerage agreement); *see also Fontenot*, 91 F.2d at 1214 (indemnity provisions that contain language "similar to 'arising in connection herewith' . . . unambiguously encompass all activities reasonably incident or anticipated by the principal activity of the contract"). Supreme thus agreed to indemnify Fieldwood for Supreme's own counterclaims. Accordingly, Supreme's claims against plaintiffs are "released and waived as a matter of law." *Fleet Operators*, 2022 WL 2865871, at *5.

In its opposition to plaintiffs' motion for summary judgment, Supreme relies on *Batiste v. Quality Construction & Production, LLC*, 327 F. Supp. 3d 972 (W.D. La. 2018). In that case, the court found that under the plain language of a master time charter agreement between Kilgore and a charterer of a vessel, the charterer owed the vessel owner defense and indemnification, even though the vessel owner was not a party to the master time charter agreement. *Id.* at 979. Supreme argues that, like the vessel owner in *Batiste*,

it is owed indemnification pursuant to the Master Time Charter even though it is not a party to that agreement.  But the charterer in *Batiste* did not rely on an indemnification provision in a brokerage agreement in opposition to the vessel owner's claim for indemnification.  The *Batiste* court thus had no opportunity to assess the issue central to plaintiffs' motion: how to assess a claim for indemnity under a master time charter agreement in light of a broad indemnification provision in a brokerage agreement.

Supreme's other arguments do not change this Court's conclusion. Supreme claims that Article 5 of the Brokerage Agreement must be read in context with the integration clause in the Master Time Charter.[52]  But there is no integration clause in the Master Time Charter.  There is a merger clause, but the most the merger clause establishes is that the Master Time Charter "comprises the full and complete agreement of the Parties hereto with respect to the matters set forth herein and supersedes all prior communications, understandings and agreements between the Parties[.]"[53] The merger clause is limited to the parties to that agreement—Kilgore and Fieldwood—and "merely confirms that all prior communications, understandings, and agreements between the 'Parties' to the [Master Time

---

[52]    R. Doc. 20 at 18.
[53]    R. Doc. 17-6 ¶ 30.

Charter] are superseded and merged into the [Master Time Charter], thereby rendering inadmissible any parole evidence." *Fleet Operators, Inc.*, 2022 WL 2865871, at *4.  It has no impact on the separate agreement reached by Supreme and Kilgore in the Brokerage Agreement.

Supreme contends that the statement in the Brokerage Agreement that "the charter of Operator's vessel will be controlled by the Time Charter" means that the indemnity provision of the Master Time Charter trumps Article 5 of the Brokerage Agreement.[54]  Supreme also points to the language in the Master Time Charter that "[t]his Agreement shall govern the respective rights and duties of Owner and Charterer with respect to the charter of Owner's vessel(s) by Charterer."[55]  The brokerage agreement and master time charter agreement at issue in *Fleet Operators* included this very language, and the court nevertheless held that the vessel operator effectively waived its right to claim indemnification in the brokerage agreement.  2022 WL 2865871, at *4.  Here, as in *Fleet Operators*, this language does not mean that Article 5 of the Brokerage Agreement need not be enforced.

Finally, Supreme is wrong that enforcing Article 5 of the Brokerage Agreement would render the indemnification provision in the Master Time

---

[54]  R. Doc. 20 at 18.
[55]  *Id.* at 3.

Charter a nullity.  The Court does not conclude that that indemnification provision is meaningless or that there are no set of circumstances under which it could apply to any party.  Had Supreme not broadly agreed to indemnify charterers for all claims incidental to the Brokerage Agreement, presumably Supreme could have availed itself of the indemnification provision in the Master Time Charter, much like the vessel owner in *Batiste*. 327 F. Supp. 3d at 979.  But Supreme waived its right to do so when it entered into the Brokerage Agreement.  The Court's conclusion today is necessary to give effect to the plain language of Article 5 of the Brokerage Agreement and to harmonize the indemnity provisions of the two contracts.  *See Chembulk Trading LLC v. Chemix Ltd.*, 393 F.3d 550, 554 (5th Cir. 2004) ("A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous.").

## IV.   CONCLUSION

    For the foregoing reasons, the Court DENIES Express Weld's motion for summary judgment[56] and plaintiffs' cross-motion for summary judgment

---

[56]     R. Doc. 16.

against Express Weld.[57]  The Court GRANTS plaintiffs' motion for summary

judgment against Supreme.[58]


New Orleans, Louisiana, this   10th   day of February, 2023.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[57]     R. Doc. 18.
[58]     R. Doc. 17.